## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RGN-GROUP HOLDINGS, LLC, a Delaware limited liability company, *et al.*[1] | Case No. 20-11961 (BLS) (Joint Administration Requested) |
| Debtors. | |

## DECLARATION OF JAMES S. FELTMAN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST-DAY RELIEF

I, James S. Feltman, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a managing director of Duff & Phelps, LLC, an advisory firm providing governance, risk and transparency solutions for clients across diverse sectors, including publicly traded and privately held companies, law firms, government entities and investment organizations such as private equity firms and hedge funds.  My practice at Duff & Phelps is focused on providing fiduciary, advisory consulting, and expert witness testimony in areas including insolvency, restructuring, accounting, and financial statement reporting.  I have served as an appointed fiduciary with a branch of the United States Department of Justice spanning nearly 30 years, have been appointed as an advisor by both federal (district and bankruptcy) and state courts, have served as an arbitrator and mediator, and have been appointed as a Monitor by

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's Federal Employer Identification Number ("FEIN"), where applicable, are as follows: RGN-Group Holdings, LLC, RGN-National Business Centers, LLC (7723), H Work, LLC (4516), RGN-Columbus IV, LLC, RGN-Chapel Hill II, LLC, RGN-Chicago XVI, LLC, and RGN-Fort Lauderdale III, LLC.  The aforementioned Debtors that do not include a FEIN are disregarded entities for tax purposes and do not have FEINs.  The mailing address for the Debtors is 3000 Kellway Drive, Suite 140, Carrollton, Texas 75006 (Attn: James S. Feltman, Responsible Officer).

the U.S. Federal Trade Commission.  Prior to joining Duff & Phelps, I had over two decades of experience with "Big 4" accounting firms, and was previously a partner at Mesirow Financial, Arthur Andersen LLP, and KPMG LLP.  I earned an M.P.S. from Cornell University and a B.A. from the University of Wisconsin, Madison.  I am a Certified Public Accountant.

2.      Duff & Phelps was retained by each of the above-captioned debtors and debtors in possession (the "Debtors") prepetition to provide interim management services.  I am the Responsible Officer for each of the Debtors, effective as of the dates of their respective bankruptcy filings.  In this capacity, I am responsible for assisting in the management of the Debtors' operations, overseeing their liquidity management, and assisting with their restructuring process.  In the course of this engagement, and working with the Debtors' management and outside counsel (Faegre Drinker Biddle & Reath LLP) and financial advisors (AlixPartners, LLP), I have become familiar with the operations and financial affairs of the Debtors and their non-debtor affiliates.

3.      On July 30, 2020, RGN-Columbus IV, LLC ("Columbus IV") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with this Court.  On August 2, 2020, RGN-Chapel Hill II, LLC ("Chapel Hill II") filed its voluntary chapter 11 petition with this Court.  On August 3, 2020, RGN-Chicago XVI, LLC ("Chicago XVI") filed its voluntary chapter 11 petition with this Court.  On August 8, 2020, RGN-Fort Lauderdale III, LLC ("Fort Lauderdale III" and, together with Columbus IV, Chapel Hill II, and Chicago XVI, the "SPE Debtors") filed its voluntary chapter 11 petition with this Court.  On August 17, 2020, RGN-Group Holdings, LLC ("Holdings"), RGN-National Business Centers, LLC ("RGN-NBC"), and H Work, LLC (f/k/a HQ Global Workplaces LLC) ("H Work" and, together with Holdings and RGN-NBC, the "Guarantor

2

Debtors") filed their voluntary chapter 11 petitions with this Court.[2]  I understand that each of the Debtors is a "small business debtor" as defined by section 101(51D) of the Bankruptcy Code. The Debtors have elected for subchapter V of chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1181-1195, to apply to their chapter 11 cases (the "Chapter 11 Cases").

4.      The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1182(2) and 1184 of the Bankruptcy Code.  No request for the appointment of a creditor's committee, chapter 11 trustee, or examiner has been made in these Chapter 11 Cases, and none have been appointed.  On July 31, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed Natasha Songonuga to serve as the trustee under section 1183(a) of the Bankruptcy Code (the "Subchapter V Trustee") for Columbus IV.  The U.S. Trustee subsequently appointed Ms. Songonuga as the Subchapter V Trustee for Chapel Hill II and Chicago XVI on August 10, 2020, and for Fort Lauderdale III on August 13, 2020.[3]

5.      As set forth in Part IV, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.      I submit this Declaration pursuant to Bankruptcy Rule 1007 to provide an overview of the Debtors' business and these Chapter 11 Cases and to support the Debtors' applications and motions for "first-day" relief described in paragraph 32 below (collectively, the "First-Day Motions").  Except as otherwise indicated herein, all facts set forth in this Declaration

---

[2] As used herein, the term "Petition Date" refers to the date of commencement of the applicable Debtor's (or Debtors') chapter 11 proceedings.

[3]  Although Ms. Songonuga has not yet been officially designated as Subchapter V Trustee in the Guarantor Debtors' chapter 11 cases, I anticipate that she will be so designated.

are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, consultation with the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I believe all information herein to be true to the best of my knowledge. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7.     To familiarize the Court with the Debtors, the Chapter 11 Cases, and the relief sought in the First-Day Motions, this Declaration provides a summary overview of the Debtors and the Chapter 11 Cases, and is organized as follows. Part I describes the Debtors' business operations, corporate structure, key liabilities, and estate assets. Part II describes the events leading up to the commencement of the Chapter 11 Cases. Part III summarizes the Debtors' goals in commencing these Chapter 11 Cases. Part IV sets forth my basis for testifying to the facts underlying and described in the First-Day Motions.

## I.     BACKGROUND REGARDING THE DEBTORS

### A.     Overview of the Debtors' Business

8.     The Debtors are direct or indirect subsidiaries of Regus Corporation, a Delaware corporation, that, together with its affiliates (collectively, "IWG" or the "Company"), offers a network of on-demand office and co-working spaces, and ancillary services and support, to a variety of clients across a host of industries in over 1,000 locations in the United States and Canada.

9.     IWG's business model begins with entry into long-term non-residential real property leases (each, a "Lease") with property owners (each, a "Landlord") that provide the

Company unoccupied office space (the "Centers").  Based on significant market research on potential client needs in local markets and the unique requirements of their existing clients, IWG engineers each of the Centers to meet the architectural style, service, space, and amenity needs of those individuals, companies, and organizations who will contract for use of subportions of the Centers.  IWG markets its Centers under an umbrella of different brand names, each tailored to appeal to different types of clients and those clients' specialized needs.  These clients (the "Occupants") enter into short-term licenses (each, an "Occupancy Agreement") to use portions of the Centers, which are customizable as to duration, configuration, services, and amenities. When operating successfully, a Center's Occupants' license payments ("Occupancy Fees") will exceed the combined cost of the underlying long-term lease, management cost, and operating expenses of the Center.

10.     The lessee on each Lease (each, a "Lease Holder") is typically a special-purpose entity (SPE) formed for this specific purpose—including, for example, the SPE Debtors. However, certain IWG entities act as Lease Holder for multiple Leases—including, for example, Debtors RGN-NBC and H Work.  Certain Lease Holders' obligations under their respective Leases are partially or fully guaranteed by another IWG entity, including in some cases Debtors RGN-Group Holdings, LLC ("Holdings"), H Work, and RGN-NBC (collectively, the "Guarantor Debtors").[4]

11.     Debtor Holdings differs from the other Debtors in that it is not a Lease Holder, but rather owns all of the furniture, fixtures, equipment, and other personal property

---

[4] Non-debtor Regus Plc S.A., a Bailiwick of Jersey entity headquartered in Luxembourg, is also guarantor of certain of the Leases.

(collectively, the "FF&E") located in the respective Centers in United States.[5]  Holdings leases this FF&E to the applicable Lease Holder—including the SPE Debtors, RGN-NBC, and H Work, as well as hundreds of non-debtor entities—pursuant to the Equipment Lease Agreements described below.

**B.      Corporate Structure**

12.      The Debtors are single-member, member-managed Delaware limited liability companies that are indirect (in the case of RGN-NBC) or direct (in the case of all other Debtors), wholly-owned subsidiaries of Regus Corporation.

13.      Regus Corporation, in turn, is a wholly-owned subsidiary of Regus Group Limited, a company organized under the laws of the United Kingdom.  Regus Group Limited, in turn, is a wholly-owned subsidiary of IWG Group Holdings Sarl, a company organized under the laws of Luxembourg.  IWG Group Holdings Sarl, in turn, is a wholly-owned subsidiary of IWG Enterprise Sarl, a company also organized under the laws of Luxembourg.  IWG Group Holdings Sarl, in turn, is a wholly-owned subsidiary of IWC Plc, a company organized under the laws of the Bailiwick of Jersey with a head office in Switzerland.

14.      A simplified organizational chart of IWG including Regus Corporation, the Debtors, and certain of their affiliates who are or may potentially become relevant in these Chapter 11 Cases, is attached as Exhibit 1 hereto.

---

[5] FF&E located at the Centers in Canada is owned by the applicable Lease Holder entities, which are non-debtor affiliates of the Debtors (represented by the "Tenant LPs" group on the organizational chart attached as Exhibit 1 hereto).

**C.** **Debtors' Principal Indebtedness**

15.     As discussed below, the Debtors' principal prepetition indebtedness is to certain affiliates (including Regus Corporation, the Debtors' parent and prepetition secured lender) and to Landlords.

*(i)*     ***Secured Indebtedness to Regus Corporation***

16.     The Debtors, certain other borrowers thereunder, and Regus Corporation are parties to that certain Senior Loan and Security Agreement, dated as of August 1, 2013 (as amended, restated, or modified at any time, the "Loan Agreement" and, together with the other documents, instruments, and agreements executed in connection therewith or related thereto, collectively, the "Loan Documents"), whereby Regus Corporation provides working capital loans, on a senior-secured basis, for the operation of the Debtors' respective businesses. Pursuant to the Loan Documents, the Debtors' obligations to Regus Corporation are secured by a first-priority security interest in all of the Debtors' assets.  The table below illustrates the approximate balances, if any, owed by the Debtors for principal, interest, fees, and charges payable pursuant to the Loan Documents, as of the dates of the best available data, namely: (i) June 30, 2020, for the SPE Debtors, and (ii) December 31, 2019, for the Guarantor Debtors:[6]

---

[6] Determination of balances as of the Debtors' respective Petition Dates requires reconciliation of intercompany accounts between the Debtors, RGM, and Regus Corporation, which is in process.

| Debtor | Approximate Debt to Regus Corporation |
|---|---|
| Columbus IV | $1,200,367 |
| Chapel Hill II | $1,623,085 |
| Chicago XVI- | $1,834,811 |
| Fort Lauderdale III | $476,419 |
| Holdings | $427,845,000 |
| RGN-NBC | - |
| H Work | - |
| **TOTAL** | **$432,979,681** |

17.     On August 7, 2020, Columbus IV and Regus Corporation entered into a

*Stipulation (I) Authorizing Use of Cash Collateral and Providing Adequate Protection and*

*(II) Confirming Administrative Expense Status for Further Advances* [Case No. 20-11894,

D.I. 12] (the "Cash Collateral Stipulation"), which provided for the payment of August rent to

Columbus IV's Landlord from any cash collateral of Regus Corporation or, to the extent such

cash collateral was insufficient, as an extension of unsecured credit by Regus Corporation

pursuant to section 364(a) of the Bankruptcy Code pending the negotiation and entry into a more

comprehensive debtor-in-possession financing arrangement to be brought before the Court for

approval in the coming weeks.  In accordance with the Cash Collateral Stipulation, August rent

in the amount of approximately $117,000 was paid to Columbus IV's Landlord on or about

August 7, 2020.


*(ii)     Prepetition Lease Arrearages*

18.     As of the Petition Date, the Lease Holder Debtors were in arrears to Landlords

under certain of their respective Leases in the prepetition amounts set forth in the table below:

| Debtor | Prepetition Lease Arrearages |
|---|---|
| Columbus IV | $372,384 |
| Chapel Hill II | $117,759 |
| Chicago XVI- | $82,277 |
| Fort Lauderdale III | $318,205 |
| RGN-NBC | $262,741 |
| H Work | - |
| **TOTAL** | **$1,153,366** |

### (iii)   *Contingent, Unliquidated Liabilities Under Guaranteed or Assigned Leases*

19.     As of the Petition Date, the Guarantor Debtors were guarantors of, or co-liable as original tenant-assignor,[7] approximately 656 Leases in total—83 for Holdings, 381 for RGN-NBC, and 192 for H Work.  I am advised, and therefore believe, that the Guarantor Debtors' liabilities associated with guaranteed and assigned Leases were all contingent and unliquidated as of the Petition Date.

### (iv)   *Other Amounts Due to Affiliates*

20.     <u>Management Agreements</u>.  Each of the Lease Holder Debtors is party to a Global Full Service Management Agreement (each, a "<u>Management Agreement</u>") with non-debtor affiliate Regus Management Group, LLC ("<u>RMG</u>"),[8] pursuant to which RMG provides certain Management Services (as defined in the Management Agreement) to the Lease Holder Debtors

---

[7] For example, where a Guarantor Debtor had been the original Lease Holder but then assigned its rights under the Lease to an SPE without receiving a novation from the Landlord.

[8] RMG is a wholly-owned subsidiary of Regus Corporation, the Debtors' secured lender and parent.

in connection with the operation of their respective Centers, which include, among other things, the entry into Occupancy Agreements with the Occupants of the Centers. The Lease Holder Debtors are obligated under their Management Agreements to fully reimburse RMG for its Gross Expenses (as defined in each Management Agreement as the aggregate of cost directly incurred by RMG in performing the Management Services for the specific Center), and to pay RMG a monthly management fee equal to five and one-half percent (5.5%) of the Gross Revenues (as defined in the Management Agreement) received directly or indirectly by RMG from the Occupants or anyone else using a Center.[9]

21.     In the ordinary course of business under the Management Agreement, prepetition, among other duties, RMG would bill and collect all Occupancy Fees from Occupants of a Lease Holder Debtor's Center(s), which would be booked to the intercompany account for the applicable period along with other intercompany transactions between RMG and the Lease Holder Debtor for services and other costs incurred for the period. The resulting net balance between the Lease Holder Debtor and RMG would then be transferred to Regus Corporation at each month-end closing of the books. Additionally, as lease payments came due for the Lease Holder Debtor each month, RMG would initiate the lease payment to the Landlord on behalf of the Lease Holder Debtor, and as the payment clears, RMG would fund an account maintained by RMG for the benefit of the Lease Holder Debtor, bringing the bank balance back to zero. In periods where Occupancy Fees for the Lease Holder Debtor's Center(s) exceeded Lease payments and other costs funded by RMG in the period, it would result in a receivable due from

_____

[9] To be clear, following their respective Petition Dates, the Lease Holder Debtors have not paid any management fees or expense reimbursements to RMG, and they do not presently intend to do so absent further order of the Court. The Debtors intend to seek relief with respect to payment of post-petition fees and expenses to RMG in connection with their debtor-in-possession financing.

Regus Corporation to the Lease Holder Debtor (or be netted against any pre-existing balance between those parties) (such excess amount, the "Surplus Fees"). In periods where Occupancy Fees were less than the lease payments and other costs funded by RMG, it would result in a payable due from the Lease Holder Debtor to Regus Corporation (or be netted against any pre-existing balance between those parties).

22.     In the ordinary course of business, the Debtors, RMG, and Regus Corporation close their books for a given month approximately twenty days after the end of the month. Thus, given the timing of these Chapter 11 Cases, the Debtors, RMG, and Regus Corporation have not yet closed their respective books for July and August 2020, which will be necessary to determine the definitive amounts of any balances due to RMG and Regus Corporation as of the respective Petition Dates. However, as of their respective Petition Dates, the Lease Holder Debtors were indebted to RMG in the *approximate* amounts set forth in the table below for prepetition expenses and management fees:

| Debtor | Approximate Prepetition Debt to RMG |
|---|---|
| Columbus IV | $28,054 |
| Chapel Hill II | $55,087 |
| Chicago XVI- | $38,321 |
| Fort Lauderdale III | $52,473 |
| RGN-NBC | $593,385 |
| H Work | $638,129 |
| **TOTAL** | **$1,405,447** |

23.     Equipment Lease Agreements. Each of the Lease Holder Debtors is party to an Equipment Lease Agreement (each, an "Equipment Lease Agreement") with Debtor Holdings,

pursuant to which Holdings leases to the Lease Holder Debtor the FF&E that is used in the

applicable Center(s).  For its part, the Lease Holder Debtor is obligated for the original cost of

the FF&E plus a finance fee and any direct costs incurred by Holdings to provide the FF&E to

the Lease Holder Debtor (such as insurance, maintenance, etc.), plus a margin fee.[10]  As of their

respective Petition Dates, the Lease Holder Debtors were indebted to Holdings in the

approximate amounts set forth in the table below for amounts due under the Equipment Lease

Agreements:

| Debtor | Approximate Prepetition Debt to Holdings |
|---|---|
| Columbus IV | $61,864 |
| Chapel Hill II | $66,800 |
| Chicago XVI- | $47,260 |
| Fort Lauderdale III | $96,072 |
| RGN-NBC | $304,572 |
| H Work | $370,505 |
| **TOTAL** | **$947,072** |

24.    <u>Franchise Agreements</u>.  Each of the Lease Holder Debtors is party to a Franchise

Agreement for Operation of Regus Business Centre (each, a "<u>Franchise Agreement</u>") with non-

debtor affiliate Franchise International GmbH ("<u>Franchisor</u>"), whereby Franchisor grants the

---

[10] To be clear, following their respective Petition Dates, the SPE Debtors have <u>not</u> made any payments to Holdings under their respective Equipment Lease Agreements.  Any payments by the SPE Debtors, H Work, or RGN-NBC under their respective Equipment Lease Agreements going forward will be in accordance with applicable provisions of the Bankruptcy Code (*e.g.*, section 365(b)(5) (providing 60-day period before a debtor must resume performance on a personal property lease post-petition), and applicable orders of this Court (*e.g.*, with respect to debtor-in-possession financing or use of cash collateral).

Lease Holder Debtor the right to operate an IWG business format in their respective locations and provides certain business support services, advices, and information technology to the Lease Holder Debtors. For its part, the Lease Holder Debtor agrees to pay Franchisor of a monthly fee equal to twelve percent (12%) of the Gross Revenue (as defined in the Franchise Agreement).[11] As of their respective Petition Dates, the Lease Holder Debtors were indebted to Franchisor in the approximate amounts set forth in the table below for amounts due under the Franchise Agreements:

| Debtor | Approximate Prepetition Debt to Franchisor |
|---|---|
| Columbus IV | $5,827 |
| Chapel Hill II | $13,200 |
| Chicago XVI- | $6,710 |
| Fort Lauderdale III | $27,253 |
| RGN-NBC | $306,359 |
| H Work | $215,151 |
| **TOTAL** | **$671,681** |

## D.    Debtors' Principal Assets

25.    Holdings' principal assets consist of its FF&E and its rights under the Equipment Lease Agreements. As of December 31, 2019, the FF&E had a book value of approximately $999 million.

---

[11] To be clear, following their respective Petition Dates, the SPE Debtors have not paid any fees to Franchisor, and they do not presently intend to do so absent further order of this Court. I am aware that Columbus IV's accounting records, which are maintained by RMG, show a payment to Franchisor or about the Petition Date. However, I understand that this payment was an accounting journal entry reflecting the accrual of an intercompany balance, and was not accompanied by any transfer of funds from Columbus IV to Franchisor.

26.     The remaining Debtors' principal assets consist of their rights under their respective Leases, Equipment Lease Agreements, Management Agreements, and Franchise Agreements, as well as their right to receive the net Occupancy Fees from the operation of their respective Centers.

## II.     EVENTS LEADING TO THE CHAPTER 11 CASES

27.     I understand that, following a strong first quarter in 2020, the Company experienced significant challenges during the second and third quarters as a direct result of the COVID-19 pandemic, which has severely disrupted business plans and operations for certain locations within the Company's U.S. portfolio.  With the near universal adoption of work-from-home policies (either voluntary, or government-mandated) by U.S. businesses during the early months of the pandemic, demand for temporary office space has been depressed, which I understand resulted in lower occupancy rates than were anticipated when the Company decided to make certain investments in the Centers, *e.g.*, in acquiring and building out additional space in cities in which it already had a footprint.  To attract and retain Occupants in this environment, the Company has had to cut pricing for new sales and renewals, resulting in a reduction of revenue from the space that is occupied.  And with the dramatic contraction of the overall economy during the second and third quarters of 2020, certain Occupants' inability to timely pay their Occupancy Fees—or unwillingness to do so, as part of their emergency cash-conservation measures—has impacted the Company's liquidity at the level of the U.S. portfolio.  Like so many other companies navigating these troubled times, the Company instituted a variety of comprehensive actions to reduce costs and improve cash flow and liquidity, including the deferral of rent payments and engagement with Landlords to negotiate forbearances, temporary accommodations, and, where possible, permanent modifications to the various Leases to bring

them in line with the COVID-19-adjusted market realities so as to permit the Company to continue operating Centers at those respective locations despite the uncertainty when the pandemic will subside and when (and indeed, *whether*) the U.S. will return to something resembling the pre-pandemic "business as usual."

28.    I understand that the Company has had some success in negotiations with Landlords to date, and that each success puts the Company's U.S. portfolio on an overall better financial and operational footing going forward—i.e., by reducing the amount of near- and/or long-term working capital funding that Regus Corporation would need to provide to a given Lease Holder entity for it to continue operating its Center, thus freeing up that capital to be deployed elsewhere in the portfolio.  But I understand that the inverse is also true—i.e., the breakdown of negotiations can put the entire portfolio on a less-sure footing, by requiring the immediate deployment of a disproportionate amount of liquidity (*e.g.*, to cure an accumulated Lease arrearage) in order to avoid the potential closure of a Center and potential loss of business from Occupants at that location, thus tying up capital that could otherwise have been deployed elsewhere.

29.    I understand that the Company was in discussions with the Debtors' respective Landlords concerning the arrearages under the Debtors' Leases and the potential modification of those Leases going forward, but those discussions reached an impasse with the SPE Debtors' Landlords.  I understand that Columbus IV and Chapel Hill II commenced their Chapter 11 Cases in response to notices from their respective Landlords that they would be locked out of their Centers as of a date certain, and that Chicago XVI and Fort Lauderdale III commenced their Chapter 11 Cases because they were at peril of immediate termination of their Leases and subsequent eviction from their Centers.  The Guarantor Debtors commenced their Chapter 11

Cases shortly thereafter, which I understand was to preempt both a potential "run on the bank" by Landlords exercising their rights under the various guarantee agreements, and the inevitable "race to the courthouse" that would follow.

### III.    GOALS OF THE CHAPTER 11 CASES

30.    I understand that the Debtors commenced their Chapter 11 Cases to prevent the forfeiture of the Lease Holder Debtors' Leases, and to preserve all Debtors' ability to operate their respective businesses—thereby, importantly, protecting the Occupants of the Lease Holder Debtors' Centers from any disruption to their businesses.  I expect that the "breathing spell" from Landlords' collection efforts that will be afforded by the chapter 11 process will allow the Debtors, and the Company more broadly, to more fully explore the possibility of restructuring their various contractual obligations in order to put the Company's North American portfolio on a surer footing going forward, so as to allow the Debtors to emerge from this process stronger and more viable than when they went in.  If these restructuring efforts prove unsuccessful, the Lease Holder Debtors intend to utilize the procedures available to them under the Bankruptcy Code to (i) orderly wind down the operation of the applicable Centers (including, to the extent necessary, the removal of the FF&E from the leased premises, and to the extent possible, transition of the Occupants to other locations), (ii) liquidate the amounts due to the Landlords under their respective Leases and guarantees, as well as amounts due to the Debtors' affiliates under their respective agreements, and (iii) to make distributions to creditors in accordance with their respective priorities under the Bankruptcy Code and applicable law.

### IV.    FIRST-DAY MOTIONS

31.    To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors have requested certain

relief through the First-Day Motions filed with the Court concurrently herewith. The Debtors respectfully request that this Court enter the proposed orders granting the relief requested in such First-Day Motions. I believe that the relief sought in each of the First-Day Motions (a) is vital to the Debtors' transition to, and operation in, chapter 11 with minimal interruption or disruption to their businesses or loss of productivity or value, and (b) is necessary to avoid immediate and irreparable harm to the Debtors' businesses.

32.    The First-Day Motions that are sought to be heard at the "first-day" hearing in these Chapter 11 Cases are as follows:

- *Debtor's Motion for Order Authorizing (I) Joint Administration of Chapter 11 Cases and (II) Filing of a Consolidated Creditor Matrix*

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment to Utility Companies and (II) Granting Related Relief*

- *Guarantor Debtors' Joinder to Certain First-Day Motions Filed in Chapter 11 Cases*

- *Application of the Debtors for Entry of an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date*

- *Debtors' Motion for an Order Authorizing RGN-National Business Centers, LLC to Serve as Foreign Representative on Behalf of the Debtors' Estates*

- *Debtors' Motion for Interim and Final Orders Establishing Notification Procedures for Lease Termination*

33.    I have reviewed each of the First-Day Motions (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First-Day Motions are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First-Day Motions.

34.     Furthermore, as a result of my personal knowledge, information supplied to me by other members of Debtors' management, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' professional advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First-Day Motions is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy and to avoid immediate and irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

For the reasons stated herein and in each First-Day Motion, I respectfully request that each First-Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: August 17, 2020                    _/s/ James S. Feltman_____
                                          James S. Feltman
                                          Responsible Officer