**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>RGN-GROUP HOLDINGS, LLC, a Delaware limited liability company, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-11961 (BLS)<br>(Jointly Administered)<br><br>Re: D.I. 75 |

**DECLARATION OF STEPHEN SPITZER IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, AND (IV) GRANTING RELATED RELIEF**

I, Stephen Spitzer, hereby declare under penalty of perjury:

1.  I am a Managing Director of AlixPartners, LLP ("AlixPartners"), an affiliate of AP Services, LLP, which was retained by the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have been working with the Debtors since AlixPartners was retained to advise the Debtors on their restructuring efforts prior to the commencement of the Chapter 11 Cases. I am generally familiar with the Debtors' books and records that reflect, among other things, the liability of the Debtors' estates and the amounts owed to the Debtors' creditors as of the Petition Date. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's Federal Employer Identification Number ("FEIN"), where applicable, are as follows: RGN-Group Holdings, LLC, RGN-National Business Centers, LLC (7723), H Work, LLC (4516), RGN-Columbus IV, LLC, RGN-Chapel Hill II, LLC, RGN-Chicago XVI, LLC, and RGN-Fort Lauderdale III, LLC. The aforementioned Debtors that do not include a FEIN are disregarded entities for tax purposes and do not have FEINs. The mailing address for the Debtors is 3000 Kellway Drive, Suite 140, Carrollton, Texas 75006 (Attn: James S. Feltman, Responsible Officer).

*Code, (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [D.I. 75] (the "DIP Motion").[2]

2. I received my B.A. in economics from the University of Pennsylvania. I have more than 20 years of corporate finance, advisory and restructuring experience. I have obtained a Certified Insolvency and Restructuring Advisor designation. Since joining AlixPartners, I have provided restructuring advice to companies, creditors, shareholders, and other interested parties on restructuring transactions both in chapter 11 and on an out-of-court basis. I have been involved in a number of chapter 11 cases in the District of Delaware, including Charys, Inc., Hexion, Inc., Sungevity, Inc. VER, Inc. and VIP Cinema Holdings, Inc.

3. Except as otherwise stated herein, the statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' officers or advisors, or employees of AlixPartners working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their businesses. If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

4. In forming the views set forth herein, I have relied upon and/or considered, among other things, the following: (a) my experiences in chapter 11 cases, including with debtor in possession ("DIP") financing facilities; (b) the DIP Motion and DIP Facility;(c) the *Declaration of James S. Feltman in Support of Chapter 11 Petitions and First-Day Relief* (the "First-Day Declaration") [D.I. 3]; (d) certain of the Debtors' financial statements and reports; (e) documents

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the DIP Motion.

related to the proposed DIP Facility and prepetition credit facilities; (f) discussions with the Debtors' management and advisors concerning the Debtors' business and finances; (g) our understanding of the Debtor's liquidity, operational situation and prepetition capital structure; and (h) discussions with certain other advisors to the Debtors.

### The Debtors' Immediate Liquidity Needs

5.  I am generally familiar with the Debtors' current liquidity and the prepetition secured facility's impact on liquidity, and I understand the Debtors' cash needs during these Chapter 11 Cases. I am also generally familiar with the Budget and the Debtors' cash flow forecasts. I understand that these forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on business operations, fees and interest expenses associated with postpetition financing, professional fees, and other required operational payments. I also considered the individual needs of each of the Debtors and their ability to share funds on an intercompany basis. Based on my discussions with the Debtors' management and advisors, my experience in restructuring, and my familiarity with the Debtors, I believe the Debtors lack sufficient funds to satisfy the costs of their Chapter 11 Cases, near-term operational cash needs, and ongoing business operations.

6.  As part of its evaluation, AlixPartners worked with the Debtors to develop and analyze the Debtors' long-term and 13-week cash flow forecasts, which take into account anticipated cash receipts and disbursements during the projected period and for the estimated duration of the Chapter 11 Cases and considered a number of factors, including the effect of the chapter 11 filing on the operations of the business, interest expenses associated with the DIP Facility, professional fees, and required payments under the Leases, under the agreements described

3

in the Intercompany Motion, and other third-party payments. The Budget suggests that over the initial 13-week period, the Debtors have a cash flow deficit of approximately $1,300,000. Additionally due to the timing of certain payments like rent, the individual cash needs of each of the Debtors, and the estimated delay in receipts caused by payment delays by the Occupants, the Budget shows an estimated DIP funding need of approximately $4,500,000 on an interim basis through the week of September 28.

7. In light of the Debtors' liquidity constraints, AlixPartners commenced an evaluation of the Debtors' financing needs prior to the Petition Date. AlixPartners worked closely with the Debtors, their management, and their advisors to determine the Debtors' cash requirements for their businesses. AlixPartners also assessed the state of the market in which the Debtors would be seeking financing and the nature of the collateral of each of the Debtors. AlixPartners determined that the availability of, and options for, postpetition financing would be restricted by the nature of the Debtors' assets, their complex intercompany transactions with non-debtor entities, and the significant amounts due under the Prepetition Financing Documents.

8. Without access to the DIP Facility, the Debtors have limited cash on hand, and based on the Debtors' liquidity forecast, I do not expect the Debtors to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operational needs and the projected costs of these chapter 11 cases. As a result, AlixPartners and the Debtors agreed that locking in sufficient financing at the start of the Chapter 11 Cases is necessary for the Debtors. Accordingly, I believe that the Debtors' proposed DIP Facility is necessary and will provide the liquidity not available on a "cash collateral" basis alone

**The Proposed DIP Financing**

9. In light of the foregoing, the complicated nature of the Debtors' assets, and the significant amounts owed under the Prepetition Facility Documents, AlixPartners concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lender. As a result, the Debtors and their advisors commenced discussions with the Prepetition Secured Party after the Petition Date around a restructuring framework that would include provision of the DIP Facility. As the direct result of these discussions, the DIP Loan Documents contemplate postpetition financing in the form of a multi-draw term loan debtor-in-possession facility in the aggregate amount of $17,500,000. Further, the DIP Facility will provide the Debtors with access to the use of the Prepetition Secured Party's cash collateral on a consensual basis.

10. In evaluating the proposal from the Prepetition Secured Party, AlixPartners reviewed 31 cases filed in the District of Delaware in the last 12 months, where the DIP loan amount provided was between $10 million and $100 million (the "Representative Sample"). In those cases, the approximate median interest rate was 9.3%, with a range from 5.3% to 18.0%. In 22 of those cases, the DIP lender required payment of an upfront, commitment, OID, or other fee, with an aggregate median fee of 3.3% and an annualized median rate of 12.1%. Additionally, 20 facilities listed a default rate, with a median default rate of 2.2%. In addition, 14 of the facilities required a roll-up of prepetition debt into the post-petition DIP facility. Of these 14 facilities, the median rate of roll-up was approximately one-for-one with the post-petition facility being provided. The range of roll-up was from 2.4% to 500% of post-petition funds being provided.

11. Based on the foregoing and current market conditions, it is my belief that the DIP Facility represents the best option available to address the Debtors' immediate liquidity needs, and that the terms and conditions of the DIP Facility are reasonable and appropriate under the

circumstances. The DIP Facility is the product of extensive good-faith, arms'-length negotiations with the DIP Lender, with the Debtors and the DIP Lender each represented by their own experienced and sophisticated counsel.

12. The terms of the DIP Facility are reasonable under the circumstances and were narrowly tailored to meet the objectives of the Chapter 11 Cases. The 6.5% interest rate under the DIP Facility is nearly 3% below the median annual interest rate in the Representative Sample. Additionally, the DIP Facility does not include the payment of any facility or other fees, and it does not include the roll-up of prepetition secured debt. The DIP Lender further agreed that the Debtors will not be required to pay the DIP Lender's fees and expenses on a current basis, which increases the Debtors' liquidity during the Chapter 11 Cases.

13. The DIP Facility also contemplates that any additional Debtors that commence a Chapter 11 Case after the filing of the DIP Motion may become borrowers under the DIP Facility and that the maximum availability under the DIP Facility may be increased to accommodate the liquidity needs of the new Debtors, subject to the consent of the DIP Lender. The ability to upsize the DIP Facility as needed to accommodate additional Debtors is the product of negotiations by the Debtors with the DIP Lender and represents a material benefit to the Debtors' ability to achieve the goals of these Chapter 11 Cases.

14. The DIP Loan Documents contains certain milestones that the Debtors must meet throughout the Chapter 11 Cases and failure to meet such milestones constitutes events of default under the DIP Loan Documents. These milestones were negotiated and required by the DIP Lender as a condition to the DIP Facility—and are necessary to meet the liquidity needs of the Debtors' businesses. These milestones were the product of negotiations by the Debtors, and I believe that these milestones are fair and appropriate and are achievable.

15. The DIP Financing is necessary to effectuate the Debtors' goals in the Chapter 11 Cases. As set forth in more detail in the First Day Declaration, the Debtors, and the Company more broadly, seek to more fully explore a restructuring of their various contractual obligations or, in the alternative, to utilize the procedures available under the Bankruptcy Code (i) to wind down the operation of certain Centers, including, to the extent necessary, the removal of the FF&E from the leased premises and, to the extent possible, transition of the Occupants to new locations; (ii) to liquidate amounts due to Landlords under their respective Leases and guarantees, as well as amounts due to the Debtors' affiliates under their respective agreements; and (iii) to make distributions to creditors in accordance with their respective priorities under the Bankruptcy Code and applicable law. A well-supported debtor-in-possession financing will provide comfort to the Debtors' creditors and Occupants that the Debtors will be able to continue to meet their commitments during these cases and are not likely to languish in bankruptcy. Accordingly, I believe that the DIP Facility is in the best interests of the Debtors' estates and should be approved on the terms and conditions described in the Motion.

16. Given that (a) the Debtors have few assets other than the FF&E, rights under their respective leases and Intercompany Agreements, (b) the Debtors' businesses involve complex intercompany transactions involving non-debtor entities, (c) there are substantial amounts owed under the Prepetition Financing Documents, and (d) traditional DIP lenders would require higher interest and facility fees for the proposed DIP financing, I believe that it is highly unlikely that the Debtors would have been able to obtain DIP financing on an unsecured or secured basis from any other source on terms as favorable to the Debtors and their estates.

### Need for Interim Relief

ACTIVE.124916241.04

17.     The Debtors require immediate access to the DIP Facility in order to pay rent and other operating expenses that become due on or shortly after September 1, 2020 and to otherwise operate their businesses, preserve value, and pursue their restructuring goals in the interim period, as set forth in the Budget, and to avoid irreparable harm pending a final hearing.

## **Conclusion**

18.     Therefore, based on my experience with DIP financing transactions, and taking into account the Debtors' circumstances, financial condition, intercreditor issues, asset base, and financial projections, I do not believe that the Debtors could have obtained any other viable DIP Facility under the circumstances. I believe that the terms of the DIP Facility are reasonable and appropriate and will provide the Debtors with the necessary liquidity during the Chapter 11 Cases.

19.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

August 30, 2020

Stephen Spitzer
Managing Director, AlixPartners, LLP