# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RGN-GROUP HOLDINGS, LLC, a Delaware limited liability company, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-11961 (BLS)<br>(Jointly Administered)<br><br>Re: D.I. 75 |

**DECLARATION OF JAMES S. FELTMAN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, AND (IV) GRANTING RELATED RELIEF**

I, James S. Feltman, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am a managing director of Duff & Phelps, LLC, an advisory firm providing governance, risk and transparency solutions for clients across diverse sectors, including publicly traded and privately held companies, law firms, government entities and investment organizations such as private equity firms and hedge funds. My practice at Duff & Phelps is focused on providing fiduciary, advisory consulting, and expert witness testimony in areas including insolvency, restructuring, accounting, and financial statement reporting. I have served as an appointed fiduciary with a branch of the United States Department of Justice spanning nearly 30 years, have been appointed as an advisor by both federal (district and bankruptcy) and state courts,

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's Federal Employer Identification Numbers ("FEIN"), where applicable are as follows: RGN-Group Holdings, LLC, RGN-National Business Centers, LLC (7723), H Work, LLC (4516), RGN-Columbus IV, LLC, RGN-Chapel Hill II, LLC, RGN-Chicago XVI, LLC, and RGN-Fort Lauderdale III, LLC. The aforementioned Debtors that do not include a FEIN are disregarded entities for tax purposes and do not have FEINs. The mailing address for the Debtors is 3000 Kellway Drive, Suite 140, Carrollton, Texas 75006 (Attn: James S. Feltman, Responsible Officer).

have served as an arbitrator and mediator, and have been appointed as a Monitor by the U.S. Federal Trade Commission.  Prior to joining Duff & Phelps, I had over two decades of experience with "Big 4" accounting firms, and was previously a partner at Mesirow Financial, Arthur Andersen LLP, and KPMG LLP.  I earned an M.P.S. from Cornell University and a B.A. from the University of Wisconsin, Madison.  I am a Certified Public Accountant.

2. Duff & Phelps was retained by each of the above-captioned debtors and debtors in possession (the "Debtors") prepetition to provide interim management services.  I am the Responsible Officer for each of the Debtors, effective as of the dates of their respective bankruptcy filings.  In this capacity, I am responsible for assisting in the management of the Debtors' operations, overseeing their liquidity management, and assisting with their restructuring process.  In the course of this engagement, and working with the Debtors' management and outside counsel (Faegre Drinker Biddle & Reath LLP) and financial advisors (AlixPartners, LLP), I have become familiar with the operations and financial affairs of the Debtors and their non-debtor affiliates.

3. I submit this Declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [D.I. 75] (the "DIP Motion").[2]  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, consultation with the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and

---

[2] Capitalized terms but not otherwise defined herein have the meanings given to them in the DIP Motion.

2

financial condition.  I believe all information herein to be true to the best of my knowledge.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

### Debtors' Prepetition Capital Structure

4. As discussed in the First Day Declaration, the Debtors' ultimate parent, Regus Corporation, as prepetition lender (in such capacity, the "Prepetition Secured Party"), has provided the Debtors' prepetition funding.  The Debtors, certain other borrowers thereunder, and the Prepetition Secured Party are parties to that certain Senior Loan and Security Agreement, dated as of August 1, 2013 (as amended, restated, or modified at any time, the "Prepetition Credit Agreement" and, together with the other documents, instruments, and agreements executed in connection therewith or related thereto, including without limitation, each of the Joinder Agreements executed by each of the Debtors, collectively, the "Prepetition Financing Documents"), whereby the Prepetition Secured Party provides working capital loans, on a senior-secured basis, for the operation of the Debtors' respective businesses.

5. Pursuant to the Prepetition Financing Documents, the Debtors granted to the Prepetition Secured Party a first-priority security interest in all of the Debtors' assets.  The balances, if any, owed by the Debtors for principal, interest, fees, and charges payable pursuant to the Prepetition Financing Documents, as of June 30, 2020 (the date of the best available data), are set forth on Schedule 1 attached to the Interim Order.

6. Debtor RGN-Group Holdings, LLC's principal assets consist of its FF&E and its rights under the Equipment Lease Agreements.  The remaining Debtors' principal assets consist of their rights under their respective Leases, Equipment Lease Agreements, Management

Agreements, and Franchise Agreements, as well as their right to receive the net Occupancy Fees from the operation of their respective Centers.

7.    As of December 31, 2019, the FF&E had a net book value of approximately $999 million, but such value includes the value of infrastructure buildout and leasehold improvements and fixtures that cannot be removed from the real property and therefore have no realizable value to these Debtors if they do not occupy the premises.. Additionally, Debtors assert that in the event they are not in possession of their respective premises, then the realizable value of the FF&E owned by Holdings is limited to removable FF&E. Thus the realizable value and related cash flows of Holdings' FF&E would be significantly less if Holding is forced to abandon infrastructure buildout and leasehold improvements and remove and liquidate its property.

**The Debtors' Need for Postpetition Financing and Use of Cash Collateral**

8.    Given the Debtors' prepetition capital structure, their challenging business environment, and continuing pressure on the Debtors' liquidity, it was apparent that the Debtors would need to seek relief under chapter 11 of the Bankruptcy Code and that they would require access to postpetition DIP financing and use of Cash Collateral for their Chapter 11 Cases to preserve operating asset and enterprise values.

9.    The Debtors and their advisors prepared a budget, a copy of which is attached as Exhibit C to the Interim Order (as amended at any time, the "Budget"), which reflects the Debtors' reasonable judgment as to the additional liquidity required over the specified period to keep the Debtors' business operational during these Chapter 11 Cases and to allow the Debtors and their advisors sufficient time to effectuate the Debtors' goals in these Chapter 11 Cases and beyond.

10.    The Debtors considered whether they could operate using only the cash generated from postpetition operations and determined, as reflected in the Budget, that the Debtors lack sufficient funds on hand and do not generate sufficient cash flows to operate their businesses and

fund working capital in the ordinary course. Therefore, even if the Prepetition Secured Party consented to use of its Cash Collateral (which consent was refused), without additional postpetition financing it would not be possible to fund ongoing operating expenses and bankruptcy-related expenses during these Chapter 11 Cases.

11. As a result, without the DIP Loans and use of Cash Collateral provided by the DIP Facility, the Debtors would not have access to sufficient liquidity to fund either their ongoing operations or the administration of these Chapter 11 Cases. Thus, the Debtors' ability to remain viable operating entities depends on obtaining the interim and final relief requested in the DIP Motion.

**The Terms of the DIP Facility Are Fair and Reasonable**

12. Based on my experience, my discussions with the Debtors' advisors regarding alternative sources of postpetition financing, and my involvement in the development of the DIP Facility, I believe that the process undertaken by the Debtors was robust, thorough, and appropriate, and produced the most favorable financing available to the Debtors under the circumstances. Moreover, in my opinion, it is essential that the Debtors have committed postpetition financing at the outset of these Chapter 11 Cases, and the DIP Lender has indicated that the DIP Term Sheet sets forth the only terms under which it would agree to provide the Debtors with postpetition DIP financing.

13. For the reasons identified in the *Declaration of Stephen Spitzer in Support of Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Section 105, 361m 362, 363, 364, and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief* (the "Spitzer Declaration"), I believe that the negotiated terms outlined in the DIP Term Sheet are the best available under the circumstances,

and that absent the relief requested in the DIP Motion, the Debtors and their estates would suffer immediate and irreparable harm.

### The Debtors' Proposed Adequate Protection Is Fair and Appropriate

14. The Debtors have negotiated a reasonable adequate protection package (the "Adequate Protection") for the benefit of the Prepetition Secured Party and with its consent. The Adequate Protection proposed for and agreed to by the Prepetition Secured Party includes, among other things, security interests and replacement liens upon all of the Debtors' assets, including Avoidance Action Proceeds (effective upon the entry of the Final Order) and proceeds or income from or in connection with Debtors' leases.

15. Based on my experience as a restructuring professional, this proposed package is consistent with adequate protection regularly accepted by secured lenders in similar circumstances. Moreover, I believe that the DIP Facility, in and of itself, provides adequate protection to the Prepetition Secured Party by providing greater flexibility in the Debtors' ability to effectively manage their ongoing business operations and thereby maximize value during these Chapter 11 Cases.

### The DIP Facility Should Be Approved

16. In light of the foregoing and based on my experience in general and for the reasons identified in the Spitzer Declaration, I believe that entering into the DIP Facility is a sound exercise of the Debtors' business judgment.

17. The Debtors, in consultation with their advisors, engaged in negotiations with the DIP Lender over the terms and structure of a DIP financing facility. The negotiations over the terms of the DIP Facility were in good faith and at arm's length, with the Debtors and the DIP Lender each represented by their own experienced and sophisticated counsel. Ultimately, the Debtors were able to reach agreement with the DIP Lender to provide the DIP Facility on the most

6

favorable terms available to the Debtors under the current market conditions and in light of the Debtors' financial condition and capital structure and the nature of the Debtors' assets.

18. I believe that the DIP Loans and use of Cash Collateral provided under the DIP Facility are necessary to the continued operations of the Debtors' businesses and will allow for the prospect of completing a restructuring with more attractive postpetition financing than any alternative available to the Debtors at this time. Access to the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, to implement and effectuate their restructuring goals, and to responsibly administer these Chapter 11 Cases.

19. Therefore, I believe that the DIP Facility represents a proper exercise of the Debtors' business judgment and the Court should authorize the Debtors to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.

[*Remainder of Page Intentionally Left Blank*]

For the reasons stated herein and in the DIP Motion, I respectfully request that the DIP Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 30, 2020

_____ Responsible Officer
James S. Feltman
Responsible Officer